Razor v. Kinsey.

## Charles Razor v. Joseph Kinsey.

55    605
198s ²144

1.  ASSAULT AND BATTERY—*At Common Law and by Statute.*—By the common law, as well as by our statutory definition, an assault and battery is a successful attempt to commit violence to the person of another, and necessarily intentional.

2.  TRESPASS—*Intention an Essential Element.*—Willfulness or intention on the part of a person to do an injury to the person of another is essential to the establishment of liability, in an action of trespass for an assault and battery. There may be trespass to the person and liability for actual damages, without intention to commit it, but not an assault and battery.

3.  ACTION OF TRESPASS—*Intention the Gist of the Action.*—In an action of trespass for an assault and battery to instruct the jury that for direct injuries to a person by a force put in motion by or in charge of another, the latter is liable in a civil action for assault and battery to the person injured for all the actual damages caused to him thereby, though unintentional and without negligence on the part of such other person, is error.

Memorandum.—Trespass. In the Circuit Court of McLean County; the Hon. THOMAS F. TIPTON, Judge, presiding. Declaration for an assault and battery; plea, general issue; trial by jury; verdict and judg-

ment for plaintiff; appeal by defendant. Heard in this court at the May term, 1894. Reversed and remanded. Opinion filed October 29, 1894.

APPELLANT'S BRIEF, FIFER & PHILLIPS AND GEORGE W. HERRICK, ATTORNEYS.

An assault and battery is said to be a fighting, against the will of the party assailed. A battery is defined as an actual infliction of violence on the person, or an unlawful, that is, an angry, rude, insolent, or revengeful touching of the person. Hilliard on Torts (3d Ed.) 181, Secs. 8 and 9.

"The intention to do harm is of the essence of an assault." 2 Greenleaf's Ev., Sec. 83.

Battery is defined to be the unlawful beating of another for which the remedy is, as for assault, by action of trespass *vi et armis*. 3 Blackstone's Com., 121.

An action for assault and battery does not lie unless the defendant was in fault or intended to commit a wrong. 1 Hilliard on Torts, 182.

It was erroneous to instruct the jury that Kinsey could recover upon any other ground than for a willful injury. Such a burden he assumed in his declaration, and as he made his bed so must he lie in it. The proposition is elementary, and scarcely requires the citation of authorities for its support. But authorities in abundance are at hand.

Where negligence is counted upon, it becomes the gist of the action, and must be alleged in the declaration. 2 Thomp. on Neg., 1246.

The plaintiff is not permitted to prove any other or different negligence than that which he alleges in his declaration. T. W. & W. Ry. Co. v. Foss, 88 Ill. 551; Camp Point Mfg. Co. v. Ballou, 71 Ill. 417; W., St. L. & P. Ry. Co. v. Fenton, 12 Ill. App. 417.

In Illinois, if a party seeks to recover for negligence, the burden is upon him, not only to allege and prove the negligence of the defendant, but also to show the exercise of due care on his own part. Kepperley v. Ramsden, 83 Ill. 354; I. & St. L. R. R. v. Evans, 88 Ill. 63; Aurora Branch

R. R. Co. v. Grimes, 13 Ill. 585; Ortmayer v. Johnson, 45 Ill. 469.

Appellee's Brief, Rowell, Neville & Lindley, Attorneys.

The action of trespass lies for any forcible injury resulting immediately from some act of the defendant, whether the injury or the act was intentional or not. Baker v. Painter, 16 Ill. 103; Amick v. O'Hara, 6 Blackf. (Ind.) 258; James v. Caldwell, 7 Yerger (Tenn.) 38; Cole v. Fisher, 11 Mass. 137; Atchison v. Dullam, 16 Brad. 42; Chitty's Pleading, 171-125-126; Underwood v. Hewson, Strange (Eng.) 596.

Where the defendant driving his carriage on the wrong side of the road when it was dark, by accident drove against plaintiff's carriage, it was holden that the injury which the plaintiff has sustained, having been immediate, trespass might be maintained. Chitty's Pleading, 127; Cooley on Torts, 440.

Where a person, in doing an unlawful act, commits a trespass to the person of another, the defense of even unavoidable accident is no excuse. Paxton v. Boyer, 67 Ill. 132.

Mr. Justice Pleasants delivered the opinion of the Court.

By this suit in trespass for assault and battery, appellee recovered judgment on a verdict against appellant for $2,500. A new trial having been denied and exceptions taken, defendant brings the record here by appeal and asks a reversal of the judgment for errors assigned upon the action of the court.

The declaration is in two counts, in each of which the alleged trespass is charged to have been committed willfully.

It appears that the parties married sisters and occupied neighboring farms, but were quite unfriendly—had come to blows more than a year before, and had not been on speaking terms since. Appellee lived about three and a half miles west of Leroy, appellant about three-quarters of a mile east of him on the same highway. Their mother-in-

law, Mrs. Vanwinkle, lived an eighth of a mile west of
appellee.  On the 16th of November, 1892, appellant took
his daughter in his road cart to the school house, a little
west of Mrs. Vanwinkle's.  On his return he stopped there
and had a few moments conversation with her.  As he was
leaving, appellee drove out of his gate in his cart and saw
him coming.  When he turned east on the road, appellant
was about one hundred and fifty yards behind him.  Ap-
pellee was driving a five-year-old mare—a "common goer"
—in a moderate trot, and appellant a three-year-old colt,
somewhat fractious and a "good mover."  He was going
enough faster to overtake appellee a little over a quarter of
· a mile east of the latter's residence, where he pulled· his
horse to the left, as if to pass him; but his right wheel ran
inside of appellee's left and struck the axle.  Appellant's
cart was upset, he thrown out, his hold of the lines broken,
and the horse with the cart ran home.  Appellee's horse
turned or whirled or pranced around for a few moments,
and then ran north without its driver, jumping the hedge,
about three feet high, that fenced the highway, and there
clearing itself from the cart.  Both of the men were con-
siderably hurt—appellee by far the most.  Besides cuts
and bruises, of which he had much the largest share, his
leg was obliquely broken just above the ankle.

Further particulars were stated by him, as follows:
" As I started out, Razor was starting from my mother-in-
law's; I glanced up and saw him, and that was the only
time I looked back.  I drove east; got just beyond my east
corner when I heard him cross the bridge; thought he was
going pretty fast  *  *  *  heard his horse running  *  *  *
it was a good wide road—as good on the right or left as
where I was, any more than I was in the beaten track.  I
didn't look back; stood straight in the road; didn't move
right or left, and on he came and ran right on to the left
wheel, right by me.  It dumped him off, opposite my
horse's head and made my horse turn around and move off,
probably ten feet.  He jumped up and said, 'D—n you,
you stopped here on purpose; G–d d—n you, I have had it

Razor v. Kinsey.

in for you,' and he grabbed me around the neck and said, ' G–d d—n you, I will kill you right here,' and he swung me back and pounded me in the face; he jumped on to me, and he was on my back with my foot in the cart, and caught me in the throat and let me have it in the face.    I don't know what way my horse was.    After he had beaten me, my foot dropped out of the cart.    As soon as it dropped out I knew just enough to get out of there, so I made an effort to turn over.    *    *    *    As I turned, my leg broke off and ran into the flesh.    He was on my back.    As I turned over on my elbows and knees, I said, ' Get off and let me alone—my leg is broke.'    He still had hold of my throat.    I saw somebody's legs by me.    It was Curt Razor. He said, ' Charlie, let him alone.'    He said, ' G–d d—n him, I have got him now; I will kill him.'    Curt finally per- suaded him to let me alone.    I turned over, and my little boy and wife came up.    She says, ' What is the matter here?'    I pointed to Razor and said, ' He done it; he done it all.'    She says to him, ' Ain't you ashamed?'    He says, ' Not a word out of you, G–d d—n you; for two cents, woman or no woman, d—n you, I would blow your brains out.'    He threw his hands back as if he was going to get a revolver.    My little girl said, ' Oh, my papa.'    He says, ' Yes, your papa; for two cents I would kick his brains out and finish it while I am at it.' "

Very widely and radically different is the account given by appellant.    After mentioning his stop at his mother-in- law's, he proceeds:  " I then started down the road toward home.    I was going home; had got about ten rods or such a matter, when Kinsey pulled out ahead of me.    *    *    *    I was trotting my horse and my whip came out of the whip socket.    I checked up, went back and got the whip.    When I drove back the colt would rear up.    I hit it a couple of cuts with the whip because it reared up.    I didn't whip it to make it run.    I did not run my horse.    I did not go out of a trot at all.    I gained on Kinsey.    Up to within a hun- dred yards he kept looking back over his shoulder.    I pulled to the left.    He pulled his horse off toward mine, and the

wheel caught. While I was pulling my horse to the left I
was still gaining on him. I would have passed him if he
had given me a chance. He pulled his horse up all of a sud-
den and caught my wheel. I had pulled my horse to the
left to pull out of the way of him. I couldn't do it. It
seems he was pulling toward me. I couldn't get around.
He checked his horse suddenly, and caught my cart wheel.
I went right over my horse—right in front of him. When
I fell my lines broke loose from my hands. I fell on the
left side of head and hip. Couldn't tell where my horse
went, I was so dazed. My wife came and said the horse
had come home. I fell on my left side and the cart wheel
struck me at the butt of the ear. I have been deaf ever
since."

After describing his injuries, he proceeds: "My brother
Curt came to me before I got up. When Curt helped me
up I saw Kinsey lying on the ground. I hadn't seen any-
thing previous to that. I thought I heard a horse going
around over the road. When I got up Kinsey's horse had
gone over the hedge. There was nothing said except that
after his wife came and the little boy, and my wife and
mother, there was some talk about a revolver—Kinsey said
he understood I was carrying a revolver for him. I told
him to come and examine me if he thought I had any
weapon. I had no conversation with Kinsey's wife till my
wife came. Our wives began to talk about matters. Can't
tell just what they did say. I did not threaten Mrs. Kinsey
or call her names. I made no threats. I did not go up to
Kinsey and pull him out of his cart. I did not strike Kin-
sey. I never touched him. I did not abuse him in any
way. * * * I did not hear Cashner say anything to me.
I don't know anything that was said. My head was hurting
me so where I was hit with the cart that I don't remember
anything that was said. I didn't explain to anybody how it
occurred."

The only other eye witness of the collision and its imme-
diate antecedents was Curtis Razor, a brother of appellant,
who was husking corn in a field south of and adjoining the

highway, about twenty corn rows distant and twenty steps west of the point of collision. He says the noise of the horses' feet coming down the road first attracted his attention, and he stepped out to see who it was. They were coming in a pretty fast trot. His brother's horse was at no time running, but was gaining on Kinsey, who looked back once, when Razor was about forty feet behind him. His statement is: "When Charley Razor went to go round him Kinsey pulled his horse toward my brother * * * and jerked up on the lines suddenly. When he did that Charlie's cart struck Kinsey's. It threw Charlie over his horse as far as his lines would let him in front of his horse. His cart upset, his lap robe and blankets scattered over the ground, and his horse ran away. Kinsey's horse wheeled around suddenly and violently and threw him off on the right side. His foot caught, but I couldn't tell how it caught. His horse kept wheeling with him, and turned to the south and went clear around the road. Kinsey was holding on to his horse. His head and the upper part of his body was on the ground at that time, and his foot was fast in the cart. I ran over there and tried to get through the hedge—started over as quick as the striking took place. The hedge is about three feet high. When I got over there I went to Kinsey. He told me his mare had broke his leg. At that time his mare had run through the hedge and left the cart in it. Then I went over to Charlie. He was lying about thirty feet from Kinsey, in the road. He had not at that time arisen from the ground at all. I took hold of him by the arm and helped him up. He seemed to be somewhat dazed. I saw blood on his face and he limped." He stated that Kinsey fell out when his horse turned suddenly around; that he saw him fall backward, with his foot caught somehow in the cart; that his face got beaten up the way it was on the weeds and by his holding on to the lines; that his brother did not go up to Kinsey before the little boy came nor within fifteen feet of him, nor say anything to Mrs. Kinsey that was " out of the way;" that he did not at any time strike Kinsey or attempt to strike him, or threaten to

strike him or do him any bodily injury; that witness did not tell him to let Kinsey alone or that he had given him enough. In short, he contradicted Kinsey and corroborated his brother on all the material points of difference between them. Razor walked home, half a mile, assisted by his wife, mother and another brother, while Curtis helped Kinsey into his (Curtis') wagon and hauled him home.

There was considerable testimony respecting alleged incidents of minor importance but claimed to have some bearing on the main question, as to which also there was direct conflict and mutual contradictions which are as irreconcilable as that of the eye witnesses of the alleged assault and battery. From all of which it fully appears that while the forcible collision of the carts and some damage to that of plaintiff as its immediate effect were conceded, the defense, earnestly urged and strongly supported by positive evidence was, that such collision was not only unintentional on the part of the defendant, but that he positively intended and endeavored to avoid it and would have avoided it but for the fault of the plaintiff, and that all the injuries to his person were also caused by such collision and attributable to his own wrong.

The first instruction given for plaintiff was as follows: "The court instructs you that if you believe from the evidence that the defendant forcibly ran his cart against the plaintiff's cart, in which the plaintiff was sitting, and thereby injured said cart and caused plaintiff's horse hitched to said cart to run away, and thereby the plaintiff received injuries which are the immediate result of said act of the defendant in running his cart against plaintiff's cart, then you should find your verdict in favor of plaintiff, even though you should believe from the evidence that defendant's act in running against the plaintiff's cart was unintentional."

This instruction seems to go upon the hypothesis that all the injuries to the person, as well as to the cart of plaintiff, were directly caused by the "forcible" running of defendant's cart against plaintiff's, and declares the law in such case to be that the defendant is liable in this action, for all actual

Razor v. Kinsey.

damages so caused, even although the collision was uninten-
tional and without requiring that the jury should find that
it occurred in the doing of an unlawful act, or of a lawful one
in a negligent manner.   The third was, "The court instructs
the jury that if they believe from the evidence that defend-
ant forcibly drove his cart against the cart of plaintiff, and
thereby caused the plaintiff to be injured, then the jury
should find the issues for the plaintiff and assess his dam-
ages at such sum as the jury may find from the evidence he
has sustained by reason of such injury;" that is, manifestly,
such as he has actually sustained.   The second and fifth alike
authorize the finding of vindictive damages if the jury
" believe from the evidence that such assault was willful."

Defendant's second modified instruction as asked, told the
jury that the declaration counted upon an assault and beat-
ing, and if they were " not convinced by a preponderance of
the evidence, that defendant, Razor, did beat, strike or abuse
the plaintiff in manner and form as stated," etc., their ver-
dict should be " not guilty."   But the court, after the name
of the defendant, interpolated the words " purposely, or for-
cibly, ran against plaintiff, or that he," and gave it as so
modified.

Thus the court, expressly and by implication, in instruc-
tions on both sides, modifying defendant's, for that purpose
or to that effect, held that for direct injuries to a person by
a force put in motion by or in charge of another, the latter
is liable in a civil action for assault and battery to the per-
son so injured, for all the actual damages caused to him
thereby, though unintentional and without negligence on
the part of the defendant.'

We hold that this is directly against the law, as declared
by the Supreme Court in Paxton v. Boyer, 67 Ill. 132, and
the authorities there cited with approval; Morris v. Platt,
32 Conn. 75; Brown v. Kendall, 6 Cushing 292; 2 Greenl.
on Ev., Secs. 85, 94.   As already stated, the declaration
in each count alleged a trespass to the person, by assault
and battery of the plaintiff.   By the common law as well
as by our statutory definition, an assault and battery is a

successful attempt to commit violence to the person, and necessarily intentional. In Wescott v. Arbuckle, 12 Brad. 580, the court say : "A battery is defined to be 'the willful touching of the person of another by the aggressor or by some substance put in motion by him;" citing Waterman on Trespass, Sec. 146; 3 Black's Comm., 120; Bacon's Abridgment, title, Assault and Battery. In Horne v. Mandlebaum, 13 Id. 609, it was said : "The injury was not only direct and immediate, but was inflicted by the defendant by a willful act of force, or in other words, intentionally. Every essential ingredient of a trespass to the person of the child, and of the action of trespass, is here present." Citing Percival v. Hickey, 18 Johns. 257; Cadwell v. Farrell, 28 Ill. 438; 1 Chit. Pl., 128. And further: "It was not necessary in order to constitute an assault and battery, that the defendant below should have touched the child with his hands or other part of his person. It is enough that he willfully set a force in motion, which caused the injury as an immediate result;" citing many authorities. Willfulness, or intention on the part of the defendant to do the injury to the person of the party injured, is held to be essential to the establishment of liability of the defendant in an action of trespass for an assault and battery, and malice or wantonness besides, to an allowance for vindictive damages. There may be trespass to the person and liability for the actual damage, without intention to commit it, but not an assault and battery.

For aught that this record discloses, the jury may have believed the testimony of the defendant and Curtis Razor, rather than that of the plaintiff, and found that all of the injuries to plaintiff were due solely to the collision of the carts, and that this was unintentional on the part of defendant; but, under the instructions given, that having put in motion and been in charge of the force that caused it, it was his misfortune that he was unable to control it, which he must bear, and pay the damage resulting to plaintiff; that the amount found was only a fair compensation for his injuries; and that, had they been instructed that there could

be no rightful recovery in this action for such unintentional injury, they would have found for the defendant.

Other questions are somewhat discussed in the arguments, which, however, in another trial, in view of this opinion, are not likely to arise.    The error above indicated is the one mainly relied on, and for that error the judgment will be reversed and the cause remanded.